J. Stanley STANARD, et al., Appellants,

v.

Fred H. URBAN, et al., Respondents.

No. C4-89-1373.

Court of Appeals of Minnesota.

April 17, 1990.

Robert D. Stoneburner, Paynesville, for appellants.

Ronald R. Frauenshuh, Frauenshuh and Spooner, P.A., Paynesville, for respondents.

Considered and decided by WOZNIAK, C.J., and RANDALL and SCHUMACHER, JJ.

## OPINION

RANDALL, Judge.

The trial court held that the Urbans had acquired title to a parcel of land by adverse possession and entered judgment in their favor. The Stanards (legal owners) appeal from that judgment contending the trial court erred in its factual findings and legal conclusions. We reverse.

## FACTS

In 1963 appellants Stanley and Lois Stanard inherited lakeshore property on Lake Koronis legally described as follows:

> Lot 6, 7 and 8 *except the West 25 feet of Lot 8* all in Block Three (3), HUNTINGTON HEIGHTS, Stearns County, Minnesota.

In 1960, the West 25 feet of Lot Eight had been purchased by Dale Bast who, at that time, owned the lot adjacent and to the west of the 25 foot strip.

The West 25 feet of Lot Eight was a low and wet parcel of land. Dale Bast filled in the southern portion of it with dirt, elevating it approximately three and a half feet to be level with the rest of his adjacent lot. The area of land filled in by Bast includes not only the West 25 feet of Lot Eight, but also includes some amount of property on its easterly side. This is the parcel of land that is the subject of this appeal. The record does not establish the exact size of the disputed parcel.

This area is now flat and grassy. The remaining portion of Lot Eight, owned by

the Stanards, has always remained in its natural state and is lower and wooded.

On November 1, 1969, respondents Fred and Dorothy Urban purchased the lakeshore property from Dale Bast. The Urban family used the property as a seasonal or recreational summer cabin from 1969 through 1974. Since 1969, the Urbans have mowed the grass up to the woodsline and kept the weeds down each summer. They have also stored their dock on property which includes the disputed parcel during the winter months every year since 1969. In addition, the Urbans' children and grandchildren have played in the area since 1969. In the early 1970's, the Urbans planted an evergreen tree and a bush near the woodsline on the property at issue. In 1975 the Urbans converted the summer cabin into a year round home and they moved there permanently.

In 1981 the Urbans constructed a white tin storage shed which sits on a concrete slab. The white shed is positioned on the land that was filled in and leveled by Bast. According to surveys done for each party, most of the white shed is lying eight to eleven feet east of the boundary line and is concededly partially on the Stanards' property. The positioning of the boundary line itself is not in dispute, and the Stanards agree that the building of this shed could legally trigger the start of a 15–year period leading to adverse possession.

On August 30, 1988, the Stanards commenced a lawsuit against the Urbans claiming trespass and seeking removal of the white shed and an order permanently enjoining any non-permissive use of the land by the Urbans. The Urbans counterclaimed alleging they have acquired ownership of the property by adverse possession.

The trial court found that the Urbans had actual, open, hostile, continuous and exclusive possession of this portion of land since 1969, and thus concluded they had acquired title to it by adverse possession and entered judgment in their favor. The Stanards appeal from that judgment contending the trial court erred in its factual findings and legal conclusions. A parcel of land at the north end of the Stanards' property which the Urbans also claimed but which the trial court ruled still belonged to the Stanards, is not at issue on appeal.

## ISSUE

Did the Urbans prove by clear and convincing evidence that they maintained open, actual, notorious, continuous, hostile, and exclusive possession of the disputed parcel in question so as to acquire title by adverse possession?

## ANALYSIS

█ In order to establish title by adverse possession the disseizor (the disseizor is the person making the claim for title against the legal owner) must show by clear and convincing evidence an actual, open, hostile, continuous, and exclusive possession of the property for 15 years. *Ehle v. Prosser*, 293 Minn. 183, 189, 197 N.W.2d 458, 462 (1972); Minn.Stat. § 541.02 (1988). The burden rests upon the disseizor to come forward with the essential facts establishing the elements of adverse possession. *Simpson v. Sheridan*, 231 Minn. 118, 120, 42 N.W.2d 402, 403 (1950). The evidence must be strictly construed and amount to clear and positive proof before title by adverse possession will be granted. *Id.*

█ In its findings, the trial court cites the following activities of the Urbans, beginning in 1969, as establishing the elements of adverse possession: (1) mowing and maintaining the property each and every summer; (2) storing their lake equipment on the property each and every winter; and (3) allowing their children and grandchildren to play on the property.

The Stanards argue that the triggering event of the statutorily required 15 year period of possession did not occur until 1981, when the Urbans built their white storage shed on Stanards' property. We agree. The use of the Stanard property by the Urbans before that is best classified as occasional and sporadic, failing to satisfy the elements of adverse possession.[1] *See*

1. This decision is not meant to state that, as a     matter of law, adverse possession cannot start

*Romans v. Nadler,* 217 Minn. 174, 178, 14 N.W.2d 482, 485 (1944).

In *Romans,* the court held that the projection of eaves and gutters from a house and the water dripping from them was enough to satisfy the elements of adverse possession so as to acquire an easement by prescription over that portion of the adjoining lot lying under the eaves. *Id.* at 180, 14 N.W.2d at 486. However, entries onto the property lying under the eaves to put on and take off storm windows twice a year and to paint the house once every six years was only occasional and sporadic use and consequently did not establish any prescriptive rights. *Id.* 14 N.W.2d at 486. The court analogized such use to the cutting of grass on a neighbor's land.

> It is a well-known fact that many thousands of homeowners have no boundary fences and that adjoining owners occasionally trespass on their neighbors' lands in cutting grass, trimming hedges, and the like. * * * If such trespasses should be held to constitute a basis for prescriptive rights, every adjoining landowner * * * would acquire * * * an easement in his neighbors' lands to the extent of such trespasses. * * * The trespasser should be required to show by some additional acts that the entry is hostile and under claim of right * * *.

*Id.* at 180–181, 14 N.W.2d at 486.

Here, the only "additional acts" were the storing of lake equipment in the winter and the playing of children on the property. This is not sufficient to establish title by adverse possession. The Urbans argue that *Nash v. Mahan,* 377 N.W.2d 56 (Minn. Ct.App.1985) is controlling. *Nash* is distinguishable from this case because *Nash* involved facts where a cabin was situated directly on a boundary line dividing Nash's lot from his neighbor's, and the patio which adjoined the cabin was there continuously during the 15–year period.

The Stanards also argue that the 15–year continuity of the Urbans' possession was broken by an offer by Mr. Urban to purchase the disputed property from the Stanards. We agree. Continuity is broken by an acknowledgement of the owner's title by the adverse possessor before the statute has run in his favor. *Olson v. Burk,* 94 Minn. 456, 458, 103 N.W. 335, 336 (1905). Mr. Urban himself testified that he instructed a realtor, John Bolstad, to approach Stanard and see if he would sell the disputed property to Urban. Urban testified at trial in 1988 that he did so "maybe eight years ago, six years ago, something like that. I can't remember exactly." Thus, according to Urban's testimony, his conversation relative to purchasing the Stanard property would have been between 1980 and 1982. Even viewing the facts most favorably to the Urbans and disregarding the white shed issue, the 15–year period would not have been up until November 1984. Although there was other vague testimony placing the date of the offer to purchase anywhere from 1984 to 1987, Urban's own testimony constituted an acknowledgement of the Stanards' title. The trial court made no specific findings about this offer to purchase, but instead found a 15–year continuous period of adverse possession. This is erroneous because Urban's offer, which by his own testimony occurred prior to November 1, 1984, of necessity broke the needed 15–year continuity.

The Stanards also argue that an acknowledgment of ownership occurred in 1988 when the pleadings were served. The process server testified that when he served the summons and complaint on the Urbans, Mr. Urban told him, referring to the white shed, "it's no big deal, he'd move the building." We do not address the issue of whether this remark constituted an acknowledgement by Urban of the Stanards' ownership because we have reversed on other grounds. Also, with our holding that the triggering event did not occur until

---

until one puts up a building or other permanent or semi-permanent structure. We only find that on these facts the irregular and minimal use by the Urbans of the land at issue was, with the exception of building the shed, nowhere near the level of hostile possession under a claim of right necessary to trigger the start of the required 15–year unbroken period.

1981, statements by Urban in 1988 do not need interpretation since the Stanards commenced their law suit to clear title long before 1996.

The Urbans argue the start of their 15–year period was before 1969 as they claim they were able to tack on all of Dale Bast's ownership years. In its findings, the trial court stated that Bast, the owner preceding the Urbans, had "claimed as his own" the disputed area of land. From this, the Urbans attempted to argue that the trial court tacked Bast's period of ownership onto theirs. This argument fails for two reasons. First, the Urbans conceded at trial that Bast denied any claim of having actively or knowingly encroached on appellants' property. Second, although the trial court mentioned Bast in passing, the trial court selected 1969, the year Urban purchased the property from Bast, for its starting year. Therefore, we have to look at 1969 through 1984. Urbans' tacking argument is inconsistent with Bast's own sworn testimony and the trial court's con-

clusion that the period of adverse possession started in 1969. (It appears undisputed that the Urbans purchased the property from Bast on or about November 1, 1969.) Based on a thorough review of the record and application of controlling law, we find that no actions of the Urbans, until construction of the white shed in 1981, triggered the start of the 15–year period needed to claim title from another by the doctrine of adverse possession.

## DECISION

The Urbans failed to establish the elements of adverse possession by clear and convincing evidence.

Reversed.